UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

FRANCIS J. EMIG, III,              :
          Plaintiff,               :
                                   :
              v.                   :    File No. 1:03-CV-264
                                   :
ESTATE OF DOUGLAS A. COOPER,       :
          Defendant.               :
_____    :

OPINION AND ORDER

The Court held a hearing to determine the amount of damages to which Plaintiff Francis J. Emig, III is entitled for injuries arising out of an automobile accident with Douglas A. Cooper[1] on October 12, 2000.  Plaintiff seeks to recover for medical expenses, lost income, and pain and suffering as a result of injuries to his neck, shoulder, back, and lower extremities. Based upon the testimony of witnesses and documents in evidence, the Court rules as follows.

I.  FINDINGS OF FACT

A.  The Accident

1.  On October 12, 2000, Plaintiff, a resident of Pennsylvania, was driving east on Route 9 in Woodford, Vermont, in connection with his work for Sherwin-Williams Paint ("Sherwin-Williams").

---

[1]  Mr. Cooper, a resident of Vermont, died several months before this suit was filed in 2003 of causes unrelated to the accident.

2.     Upon entering a school zone and seeing the flashing yellow traffic light that marked the zone, Plaintiff slowed his car to approximately 20 to 25 miles per hour.

3.     As Plaintiff slowed and passed the flashing light, he noticed in his rearview mirror Mr. Cooper's truck about 100 yards behind him, approaching at a high rate of speed.  Plaintiff expected that the truck would slow down, however, and did not look again at the truck in his rearview mirror.

4.     Moments later, Mr. Cooper's truck struck Plaintiff's rental car from behind.

5.     The collision caused substantial damage only to Plaintiff's car, which required towing.

6.     Neither party reported injury or requested medical attention.

7.     Vermont Senior State Trooper Peter McConnell investigated the accident.  Trooper McConnell testified that, based upon Mr. Cooper's estimate of speed and the length of the skid marks on the road, Mr. Cooper was traveling at a rate between 30 and 60 miles per hour at the time of the accident.

8.     Mr. Cooper admitted to Trooper McConnell that the accident was his fault, and he was issued a ticket for Following Too Closely in violation of 23 V.S.A. § 1039.

9.     Defendant has stipulated to liability for causing the collision.

B.   Plaintiff's Employment and Income History

10.  At the time of the accident, Plaintiff worked as a Senior Project Engineer at Sherwin-Williams, overseeing construction projects for company stores from Maine to Pennsylvania.  Plaintiff also maintained a land surveying business called "Spring Garden Group."

11.  Plaintiff incorporated Spring Garden Group in 1995 after becoming a licensed land surveyor.

12.  In 1995, Plaintiff worked as a project manager for CompuEngineering, a company that designed and coordinated land development plans, including projects for Sunoco gas stations. He reached an agreement with CompuEngineering by which Spring Garden Group contracted for the surveying component of the development projects.

13.  In 1997, Plaintiff left CompuEngineering to work for Tyree Company, which performed land development work for Mobil and Getty stations.  Plaintiff made a similar agreement with Tyree by which Spring Garden Group contracted for surveying work on Tyree's development projects for Mobil and Getty.

14.  In 1998, Plaintiff returned to work at CompuEngineering because he anticipated a decrease in work at Tyree due to a falling out between Tyree and Mobil.  Spring Garden Group continued to survey for Mobil and Getty despite Plaintiff's employment with CompuEngineering, whose principal client was Sunoco.

15.  Plaintiff again left CompuEngineering in July 2000 and began work as a Senior Project Engineer at Sherwin-Williams. Plaintiff hoped to work at Sherwin-Williams for about a year, expecting that Spring Garden Group's income would be sufficient to support him thereafter.

16.  During the Summer and early Fall of 2000, Plaintiff's work for Sherwin-Williams required traveling several days each week.  With less time to do surveying work, he performed about half of Spring Garden Group's billable surveying hours on weekends and left the remainder to associates.

17.  Plaintiff claims that as a result of the injuries suffered in the October 12, 2000 accident, he was unable to do any surveying for Spring Garden Group.  He was able to do some administrative work, but used sub-contractors for the actual surveying during late 2000 and 2001.

18.  Plaintiff believed his presence was required in the field in order to certify Spring Garden Group's surveying work, but during the year 2000, sub-contractor Ken Seeley certified his own work as a surveyor.

19.  In early 2002, Plaintiff believed that his injuries would not abate and that costs associated with sub-contractors were prohibitive, so he notified customers of his decision to discontinue Spring Garden Group's services.

20.  Plaintiff presented no evidence that he sought other work to replace Spring Garden Group income.

4

21.  Plaintiff did not incur lost wages from Sherwin-Williams as a result of the accident and remains employed with the company.

22.  According to Plaintiff's W-2 forms, he earned $62,565.00 from CompuEngineering during his last full year of employment in 1999, and $85,038.00 from Sherwin-Williams during his first full year of employment in 2001.

23.  Jeffrey A. Graham provided expert testimony on behalf of Plaintiff as to lost income.

24.  Mr. Graham's report was consistent with Defendant's Exhibit G, in which Plaintiff's accountant listed Spring Garden Group's gross operating revenue and compensation to Plaintiff:

| Year | Spring Garden Group Gross Revenue | Compensation to Plaintiff |
|------|-----------------------------------|---------------------------|
| 1997 | $92,440.00 | $25,000.00 |
| 1998 | $189,724.00 | $34,500.00 |
| 1999 | $145,122.00 | $51,000.00 |
| 2000 | $63,181.00 | $11,000.00[2] |
| 2001 | $54,853.00 | $0 |
| 2002 | $30,058.00 | $0 |

25.  Spring Garden Group's gross revenue for the first six months of 2000, when Plaintiff still worked for CompuEngineering, was substantially less than for the first six months of 1998 and

---

[2]  Figures for 2000 reflect only the first three quarters of 2000 due to the unavailability of records for the last quarter.

1999.  Plaintiff did not explain why the company's revenues reached a high in 1998 and declined thereafter.

26.  Mr. Graham compared average lost income data from 1998 and 1999 -- Spring Garden Group's highest revenue years -- with data from 2001, 2002, and 2003, to calculate Plaintiff's average reduced earnings.  This results in an average inflated by high-revenue years.

27.  Mr. Graham also asked the Court to assume that revenue generated by Spring Garden Group would have continued to generate income for Plaintiff at the average it paid to him in 1998 and 1999, the two best years for Spring Garden Group.  The records, however, indicate a decline in profits and gross income for the following years until the company went out of business in 2002.

28.  Plaintiff was 50 years old and unmarried at the time of trial.

C.  Medical Testimony

29.  Immediately after the accident, Plaintiff was in a "confused" state and "hurting" physically.

30.  Plaintiff's employer sent a vehicle to bring him to Albany Airport, where Plaintiff flew to Philadelphia.  Upon arrival in Philadelphia and feeling increasing pain in his neck, back, and legs, Plaintiff drove himself to Paoli Hospital, where he received a diagnosis of "soft tissue damage," a prescription for ibuprofen, and a recommendation to see his regular physician.

31.  He spent the next three days in bed and worked part-time for the next two weeks.

32.  Basil S. Jawad, M.D., a Pennsylvania internist and Plaintiff's physician since 1997, provided expert medical testimony on behalf of Plaintiff.

33.  Mark J. Bucksbaum, M.D., a Vermont physician, performed an independent medical evaluation and provided expert medical testimony for Plaintiff.

34.  Plaintiff first sought treatment from Dr. Jawad on November 1, 2000, complaining of continuing discomfort in his back, neck, legs, and right shoulder.

35.  Dr. Jawad's initial examination of Plaintiff found the possibility of a cervical spine sprain, lumbosacral spine sprain, and rotator cuff injury in the right shoulder.  Dr. Jawad recommended pain medication, physical therapy, an x-ray of the shoulder, and an appointment with an orthopedist if there was no improvement.

36.  Plaintiff had one prior incident of muscular back pain in 1999.

37.  An x-ray on November 14, 2000 of Plaintiff's right shoulder was normal.  A magnetic resonance imaging ("MRI") test on December 18, 2000, however, revealed mild tendinopathy.

38.  On December 21, 2000, Plaintiff complained to Dr. Jawad of discomfort in his legs, and numbness and tingling in his feet. Blood tests eliminated diabetes.  Electromyography ("EMG") tests

on December 18, 2000 and October 2, 2002 were normal and revealed little to no evidence of neurological injury.

39.   In January 2001, an orthopedist twice treated Plaintiff's shoulder tendinitis with injections.

40.   Following Dr. Jawad's repeated prescriptions for physical therapy for his right shoulder, Plaintiff attended two sessions in June 2001 and ten sessions during Spring 2002. Plaintiff was discharged from therapy in April 2002 because he declined further care.

41.   Dr. Bucksbaum's permanent impairment evaluation of Plaintiff found an eight percent impairment of the whole person due to the restricted range of motion in his lower back and an eleven percent impairment of the whole person attributable to limited motion in his shoulder, resulting in an eighteen percent impairment of the whole person, according to the impairment combination chart.

42.   It is Dr. Bucksbaum's opinion, within a reasonable degree of medical certainty, that the accident caused Plaintiff's chronic right shoulder tendinitis, mechanical lower back pain, and bilateral lower extremity pain.

43.   According to Dr. Bucksbaum, Plaintiff is unable to return to work as a surveyor because he should avoid frequent lifting, bending, climbing, long standing, exposure to cold or humid environments, and repetitive motion of his right shoulder.

44.  Dr. Bucksbaum recommends chronic pain management for Plaintiff, including physical therapy for acute inflammations.

45.  Andres Roomet, M.D., a Vermont neurologist, on March 11, 2005 performed an independent medical evaluation on Plaintiff on behalf of Defendant.

46.  Plaintiff described his current symptoms to Dr. Roomet as follows: (1) minor and intermittent neck and upper back pain; (2) pain in his right shoulder on a daily basis; and (3) walking any distance causes back pain radiating into his buttocks, and (4) shooting pains with tingling in his feet, ankles, and calves.

47.  Dr. Roomet noted Plaintiff's list of therapies had included shoulder injections for tendinitis, physical therapy, a trial of acupuncture, and various nonsteroidal anti-inflammatory agents, and that Plaintiff had given up therapeutic attempts except for using a theraband resistance band for his shoulder.

48.  Dr. Roomet's assessment of Plaintiff is as follows: (1) the cervical sprain has improved and is minimally symptomatic, (2) the right shoulder is an orthopedic issue with no neurologic implications that continues to be symptomatic, (3) the lumbosacral sprain is historically related to the accident, (4) the calf and foot pain suggests tarsal tunnel syndrome.

49.  It is Dr. Roomet's opinion that tarsal tunnel syndrome most often occurs spontaneously, or can occur as the result of a trauma to the ankle, such as a fracture or a jump from a high place.  He would not expect a back injury to cause tarsal tunnel

syndrome, and noted that Plaintiff could not recall any direct impact or shock to his feet at the time of the accident.

50.  It is Dr. Roomet's opinion that tarsal tunnel syndrome can be chronic but is potentially treatable, often through steroid treatment or surgery.  He recommended an orthopedic foot consultation and an EMG for confirmation because the previous two EMGs would not have revealed it.

51.  It is also Dr. Roomet's opinion that his examination revealed no neurologic impairment in Plaintiff's neck, shoulder, or lower back, based upon the lack of muscle weakness or nerve damage.

52.  Dr. Roomet did not give a permanent impairment rating, nor would he comment on Dr. Bucksbaum's permanent partial impairment rating.  It is his opinion that the foot problem may not be permanent if appropriately addressed, and that the right shoulder is not at a medical end result.

53.  Dr. Bucksbaum disagreed with Dr. Roomet's diagnosis of tarsal tunnel syndrome, pointing out that the two earlier EMGs did not show tarsal tunnel syndrome, and even if a new EMG revealed it, it is too late to correct tarsal tunnel syndrome by surgery.

54.  Plaintiff testified that he continues to feel pain in his right shoulder when he lifts his arm above a forty-five-degree angle; occasionally feels sharp pains in his ankles that

travel up his legs to his lower back; and experiences restricted movement in his lower back.

55.   Plaintiff further testified that he has lost enjoyment of life because he can no longer jog or play amateur football.

56.   Defendant does not contest Plaintiff's claims for $6,203.25 in medical bills.

## II.   CONCLUSIONS

1.   This Court has jurisdiction based upon diversity of citizenship.   28 U.S.C. § 1332.

2.   The parties stipulate that Vermont law governs the case.

3.   Defendant admits that Mr. Cooper negligently caused the accident; therefore, there is no question of comparative negligence to address under 12 V.S.A. § 1036.

4.   Plaintiff has the burden of proving that Mr. Cooper's negligence was the proximate cause of his injuries.   Lash v. J. J. Newberry Co., 510 F.2d 429, 434 (2d Cir. 1975).

5.   Plaintiff presented sufficient evidence that the accident caused his neck sprain, back sprain, and shoulder injury.

6.   Neither Dr. Bucksbaum nor Dr. Roomet fully diagnosed Plaintiff's complaints concerning his foot, ankle, or lower legs and how they are related it to the accident, so the Court declines to award Plaintiff damages for these alleged injuries.

7.    Plaintiff claims $6,203.25 in medical bills, and Defendant does not contest that amount.  The Court therefore awards Plaintiff $6,203.25 in medical expenses.

8.    Plaintiff seeks damages for pain and suffering.  The Court awards Plaintiff $50,000 in general damages for past, present, and future pain and suffering.  See Ragona v. Wal-Mart Stores, Inc., 62 F. Supp. 2d 665, 671-72 (N.D.N.Y. 1999) (surveying recent comparable cases and awards).  This award includes consideration of Plaintiff's age of 50 years at the time of trial, and his life expectancy of 77 years, of which the Court takes judicial notice.  See National Vital Statistics Reports, Vol. 51, No. 3, Table 2 (2002).  The award for pain and suffering acknowledges the fact that Plaintiff can no longer enjoy some physical activities as he did before his injuries.

9.    The Court declines to distinguish past and future pain and suffering, or to award interest on past pain and suffering. Gilman v. Towmotor Corp., 621 A.2d 1260, 1263 (Vt. 1992) (citing Turcotte v. Estate of LaRose, 569 A.2d 1086, 1088 n.2 (Vt. 1989).

10.   Plaintiff is entitled to lost income for his inability to undertake land surveying work due to his physical impairments. To determine a reasonable estimate of Plaintiff's damages, the Court calculated the average annual wage Plaintiff received for survey work in 1997, 1998, and 1999 -- $36,833 -- and awards Plaintiff fifteen percent of that amount -- $5,525 -- annually from 2001 to 2020, when Plaintiff will reach age 65.  The total

award for lost income is $110,500.  The Court calculates the percentage based upon the combined testimony of Drs. Bucksbaum and Roomet, and declines to include interest or present value calculations in the award.

11.  The Court declines to award damages for loss of income from Spring Garden Group as being speculative.  My Sister's Place v. City of Burlington, 139 A.2d 275, 281 (Vt. 1981); Berlin Dev. Corp. v. Vermont Structural Steel Corp., 250 A.2d 189, 193 (1968).  The loss is speculative for the following reasons. First, Spring Garden Group was a new business venture with substantial business and income only during 1998 and 1999. Second, there was a significant decline in gross revenues from 1998 through 2000.  Finally, when employed by CompuEngineering and Tyree, Plaintiff could perform duties for Spring Garden Group simultaneously, but was unable to devote substantial time to the business because of his responsibilities with Sherwin-Williams. Furthermore, an estimate of a business loss based only on prior positive performance, and that fails to take into account overhead, costs, and the profitability of projects that Spring Garden Group undertook after Plaintiff left CompuEngineering in 2000, is inherently suspect.  State v. May, 689 A.2d 1075, 1077-78 (1996).

### III.  ORDER

In light of the foregoing, the Court awards plaintiff:

1.  the sum of $6,203.25 for medical expenses, plus interest at the rate of twelve (12) percent per annum from the date of judgment;

2.  the sum of $110,500 for total past and future lost income; and

3.  the sum of $50,000 in general damages for past, present and future pain and suffering.

SO ORDERED.

Dated at Brattleboro, in the District of Vermont, this 10th day of February, 2006.

/s/ J. Garvan Murtha
J. Garvan Murtha
United States District Judge